# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

CORAL GROUP, INC. and )
SENTIS GROUP, INC., )
  )
     Plaintiffs, )
  )
v. )      No. 4:05-CV-0633–DGK
  )
SHELL OIL COMPANY and )
EQUILON ENTERPRISES LLC d/b/a )
SHELL OIL PRODUCTS US, )
  )
     Defendants. )

## ORDER GRANTING MOTION FOR SANCTIONS

This lawsuit arises out of the parties' failed business relationship. Plaintiffs are two corporations that briefly engaged in the business of operating Shell-brand gasoline stations and convenience stores under contracts with Defendants. Plaintiffs are suing for fraud, breach of contract, and a violation of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-41. Plaintiffs seek over $28 million in damages.

The Court previously dismissed Plaintiffs' claims with prejudice as a sanction for discovery violations and other abuses of the judicial process. The Eighth Circuit Court of Appeals subsequently reversed and remanded the dismissal for further consideration. On remand, the case was reassigned to this Court.

Now before the Court is Defendants' Motion for Sanctions (Doc. 645). Defendants move for sanctions under Rule 37 and the Court's inherent authority arguing Plaintiffs willfully failed to comply with various discovery orders, bribed their accountant, and engaged in spoliation. Plaintiffs deny the allegations.

Following remand, the parties engaged in substantial discovery into Defendants' allegations. After the Court conducted a two day evidentiary hearing, the parties submitted post-hearing briefs.

After carefully reviewing the entire record, the Court holds as follows. First, with respect to the discovery orders, Plaintiffs willfully violated the Court's June 16, 2006 order and this violation prejudiced Defendants, so sanctions should be imposed under Rule 37(b). Accordingly, Chris Walls is stricken as an expert witness. The Court holds Plaintiffs did not willfully violate the Court's September 8, 2006 order, and so no sanction should be imposed in connection with any failure to comply with that order. Second, with respect to the bribery allegation, the Court finds the evidence is insufficient to establish that Plaintiffs attempted to bribe their accountant. Third, with respect to the spoliation claim, the Court finds Plaintiffs intentionally failed to preserve a variety of evidence, most importantly information on their accountant's computer; that the information on this computer cannot be reconstructed or replaced; and that the loss of this information has irreparably prejudiced Defendants' ability to defend this case. Accordingly, pursuant to its inherent authority, the Court orders as a sanction that Plaintiffs' case is DISMISSED WITH PREJUDICE.

Defendants' motion is GRANTED.

## Background

The Eighth Circuit Court of Appeals has previously summarized the facts and procedural posture of this case. *Sentis Group, Inc. v. Shell Oil Co.*, 559 F.3d 888, 892-98 (8th Cir. 2009). The following summary quotes extensively from this decision without further attribution.

## 1. General Background

Plaintiffs Cortis Group, Inc. ("Cortis") and Sentis Group, Inc. ("Sentis") are two corporations that briefly engaged in the business of operating Shell-brand gasoline stations and convenience stores under contracts with Defendants. These contracts are called Multi-Site Operator Agreements ("MSOs" or the "Agreements"). Under the Agreements, Defendants made expense payments to Plaintiffs to reimburse them for certain costs of maintaining retail gasoline operations. Plaintiffs allege Defendants induced Plaintiffs to enter into the Agreements and calculated subsequent payments through misrepresentations and fraud. Specifically, Plaintiffs allege Defendants provided false historic expense and profit figures and that Defendants calculated the expense payments using a method different from what they had represented at the time of contracting. The Complaint asserts state-law claims of fraud and breach of contract, as well as a claim under the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-41. Plaintiffs seek over $28 million in damages.

Discovery in this case has been protracted and contentious. The parties have frequently sought the Court's intervention in discovery matters, and the Court has held approximately 15 discovery conferences in this case.[1] Most of the disputes concerned Defendants' attempts to discover Plaintiffs' financial information, claiming it was relevant to the underlying question of liability and to the scope and cause of Plaintiffs' alleged damages.

## 2. Key Personnel

To understand the discovery dispute and the parties' actions leading to the dismissal of this case, it is necessary to explain the role of three people in this case.

---

[1] By contrast, in most cases the Court holds no more than one discovery teleconference.

Case 4:05-cv-00633-DGK   Document 655   Filed 09/30/12   Page 3 of 35

a. **Alan Barazi** is Plaintiffs' owner and principal officer. Defendants allege Barazi attempted to bribe Nick Anton, Plaintiffs' accountant, to withhold documents from Defendants that would be favorable to their case.

b. **Chris Walls** is a business consultant Plaintiffs characterize as a member of management. The majority of the parties' discovery disputes concerned discovery responses related to Walls.

Plaintiffs designated Walls as an expert on the topic of the Agreements and site operations. Prior to this litigation, Walls assisted Plaintiffs in negotiating and evaluating the Agreements. He subsequently assisted in the management and operation of the stations and in the ongoing analysis of financial performance at the stations. Although Plaintiffs now characterize Walls as an employee and insist he is a non-retained expert, Walls submitted bills to Plaintiffs on an hourly basis for his work on letterhead from his own consulting firm, TQM Consulting. At the start of litigation, Walls's resume listed TQM as his employer, but during the litigation he changed that designation and listed Plaintiffs as his employers.

Defendants assert Plaintiffs continually shifted their characterization of Walls's status back and forth between that of consultant and/or employee. Defendants claim Plaintiffs' goal was to protect certain information Plaintiffs had shared with Walls as privileged while at the same time characterizing Walls as an outside consultant so that he could view the Defendants' information that was subject to a protective order.

Production related to Walls was the primary issue that frustrated the Court and led to dismissal of the case. In its June 14, 2007 order of dismissal, the Court found it had issued four orders compelling the production of 58 documents that had been generated, considered, or relied upon by Walls, and that Plaintiffs had failed to obey each order.

4

c.   **Nick Anton** is an accountant who served as Plaintiffs' employee at the time Plaintiffs entered into the Agreements.  Plaintiffs assert that Anton's employment ceased in late 2004 or early 2005 and that he has served as an outside accounting consultant since that time. Defendants point out, however, that Barazi and Anton signed state liquor-license applications after 2005 and that the state liquor-license applications name Anton as a manager, managing officer, or managing agent.

Defendants assert Plaintiffs and Barazi lied to the Court and Defendants about Anton's status in order to prevent Defendants from gaining access to information held by Anton. Two of the issues that led to the sanction of dismissal involved Anton.  One was related to purported misrepresentations about Anton's status and Plaintiffs' failure to comply with an order to make Anton appear at a court hearing.  The other was related to a report of an alleged attempt to pay Anton to withhold information.

Anton's current whereabouts are unknown.   He appears to be actively evading all attempts to find him.

### 3.   Perceived Abuses Serving as the Basis for Dismissal

### a.   Documents and Discovery Orders Related to Chris Walls

Plaintiffs filed suit in July 2005.  In their Rule 26(a)(1) disclosures, Plaintiffs designated Walls as a person with knowledge of their claims.  In early 2006, Plaintiffs produced a privilege log to Defendants referring to 58 purportedly privileged documents Walls reviewed and/or generated.  Defendants subpoenaed Walls, and in April 2006, Plaintiffs objected, claiming Walls was Plaintiffs' employee and expert.  Plaintiffs then failed to produce Walls for a fact deposition. Defendants moved to compel separate depositions of Walls as a fact witness and as an expert witness, and the court granted the motion.

5

Walls' fact-witness deposition took place in May 2006. In the course of this deposition, Walls referred to documents he allegedly read or considered in preparing his expert report. Defendants subsequently demanded production of these documents. These documents were listed on a privilege log. Plaintiffs refused to produce them, and Defendants sought an order from the district court directing Plaintiffs to disclose them.

The Court entered it first discovery order on June 16, 2006. It stated, "For each of Plaintiffs' experts, Plaintiffs are ordered to produce the information considered by and/or relied upon in forming that expert's opinion." Plaintiffs continued to refuse to disclose the document, claiming that it was privileged and was not considered or relied upon by Walls in forming his expert opinion. Defendants again sought an order from the Court, and on July 13, 2006, the Court entered a second discovery order that is not relevant to the pending motion. Plaintiffs still failed to produce the documents, and Defendants again sought the Court's intervention. On August 17, 2006, the Court entered a third discovery order, ordering production of the documents.

On September 7, 2006, Defendants emailed a letter to the Court asking it to order Plaintiffs to produce all 58 documents. The following day, the Court issued an order that stated, in part:

> Plaintiffs are ordered to produce any and all document or analysis developed by Chris Walls relating to this litigation, regardless of whether the document is claimed as privileged or if Chris Walls relied upon said document. The documents must be produced by noon on Monday September 11, 2007[sic]. If th[ese] documents are not produced, Plaintiffs will not be permitted to present the testimony of Mr. Walls at trial.

On its face, this fourth discovery order was broader in scope than the preceding orders. On September 11, Plaintiffs petitioned the Eighth Circuit Court of Appeals for a Writ of Mandamus

seeking to avoid production under a claim of privilege. In a responsive filing, Defendants clarified that they sought merely "data or other information considered by Chris Walls in forming his opinions." The Eighth Circuit denied the petition on September 26, 2006. Shortly thereafter, Plaintiffs produced to the Court for *in camera* review documents they considered to be privileged documents related to Chris Walls without limitation to whether the documents were related to Walls's expert opinion. They also produced a different, more limited body of documents directly to Defendants.

Plaintiffs filed a motion for in camera review, and Defendants filed a motion for sanctions. Defendants alleged in their motion that the documents Plaintiffs produced directly to Defendants did not contain the 58 documents from the March 2006 privilege log and that the Bates labels on the documents were different from those referenced on the March 2006 privilege log.

The Court did not rule on the motion for in camera review. Rather, it scheduled a hearing for December 15, 2006, to address the motion for in camera review and the issue of sanctions. The December 15, 2006 hearing is discussed below. After the hearing, but before the Court entered its written order of dismissal, Plaintiffs provided a table that cross-referenced the new and old Bates labels.

### b. Plaintiffs' production of accounting information held by Nick Anton and his employment classification

A second discovery issue the Court addressed at the sanctions hearing and in the Court's order of dismissal involved the production of accounting information by Nick Anton.

Defendants sought financial reports and tax returns held by Anton during Plaintiffs' initial production of documents. By mid 2006, it was not clear that Defendants had received all of the accounting information they requested. In particular, Defendants had not received a

"payroll journal" they believed to be important to their case. Defendants had received some information as raw data that was meaningless unless opened with the same computer program used by Plaintiffs. Defendants deposed Anton in May 2006, and at that time, Anton claimed that he did not maintain a "payroll journal."

In mid-August of 2006, the Court ordered Plaintiffs to make Anton and his computer available for another deposition. Defendants deposed Anton a second time on September 13, 2006, and Anton complied with the order, bringing his computer to the deposition. After asking a few questions, Defendants discovered that Anton's computer did, in fact, contain a file named "payroll journal." Defendants terminated the deposition, reserving the right to question Anton further in the future, if deemed necessary.

### c.     Alleged Attempt to Pay Anton to Conceal Documents

A third issue cited by the Court in its order of dismissal is an alleged attempt by someone to bribe Anton to conceal information.

One of Defendants' attorneys, Betsy Badger, submitted a written affidavit to the Court in which she stated that she had received a phone call from a person she did not know who claimed to be an attorney from Houston and personal counsel for Anton. According to Badger, the person who represented himself as Anton's personal counsel from Houston alleged that Plaintiffs had offered to pay Anton to conceal data favorable to Defendants. Badger asserted that the man on the phone sought compensation from her for documents in Anton's possession. The affidavit did not allege that the man on the phone identified specifically who had made an offer to Anton.

### 4.     The District Court's Order of Dismissal

During the December 15, 2006 evidentiary hearing, Defendants made a presentation addressing, among other things, the discovery orders related to Walls and the alleged attempt to

pay Anton to conceal documents. At the end of this presentation, the Court had a heated exchange with Plaintiffs' counsel Frederick Starrett, in which Starrett denied being ordered four times to produce the same documents to Defendants. At that point, the Court ended the hearing and summarily granted Defendant's motion to dismiss this case for systematic abuse of the discovery process.

On June 14, 2007, the Court entered its written order of dismissal with prejudice (Doc. 488). The Court cataloged Plaintiffs' alleged discovery violations in detail. Among other findings, the Court held it had issued four discovery orders directing Plaintiffs to produce 58 documents; Plaintiffs had engaged in a pattern of willful discovery abuse; and Plaintiffs had attempted to bribe Anton. The Court then sanctioned Plaintiffs under Rule 37 and the Court's inherent authority.

**5.      The Court of Appeals' Order Reversing the District Court**

Plaintiffs appealed. On March 24, 2009, the Court of Appeals for the Eighth Circuit reversed and remanded, holding the district court had erred by not separating its Rule 37 analysis from the inherent authority analysis. The Eighth Circuit also questioned whether Plaintiffs' actions merited the severe sanction of dismissal.

The Eighth Circuit made the following findings relevant to the pending motion. It held that "no weight can be accorded to the alleged attempt to bribe Anton because there was no reliable evidence to support the allegation," since the allegations were grounded in hearsay not bearing any indicia of reliability. *Id.* at 900-01. It also observed that:

> If Plaintiffs or their agents actually offered to pay Anton to conceal evidence, the outcome of the sanctions question becomes clear. In fact, it may become necessary to refer this matter for possible prosecution. Allegations standing alone, however, cannot justify dismissal, and it was error to rely upon the allegations in the infirm affidavit without an investigation or an evidentiary hearing.

Case 4:05-cv-00633-DGK   Document 655   Filed 09/30/12   Page 9 of 35

*Id.* at 910.

With respect to the other discovery abuses, the Eighth Circuit reversed the Court's finding that all four orders called for production of the same documents, finding instead the orders,

> contained slightly different descriptions of the documents to be produced, and Plaintiffs read each order in a limited fashion to limit production. This behavior was evasive and appears to have been directed towards protecting a claim of privilege. While this behavior may have resulted in technical non-compliance with one or more of the orders, the court's overly broad characterization of the orders demonstrates that the orders were not clear, and it makes the existence of any non-compliance equally unclear. Further, Plaintiffs' apparent gamesmanship, while not admirable, is not necessarily indicative of a willful violation of the orders.

*Id.* at 902. As to Plaintiffs' pattern of conduct, the Eighth Circuit wrote,

> [t]o the extent the court on remand might again view a pattern of conduct as evidence of willfulness (as relevant to a possible Rule 37 violation) or, in the alternative, as evidence of bad faith (as relevant to a possible inherent-authority analysis), the court will need to address these issues anew.

*Id.* at 901. It emphasized that,

> the district court need not find Plaintiffs' actions excusable, non-prejudicial, nor innocuous. We note only that the present record contains several close questions as to Plaintiffs' willfulness, Plaintiffs' violation of one or more discovery orders, the existence of prejudice, and the appropriateness of the overall sanction of dismissal.

*Id.* at 903-04.

The Eighth Circuit's final instruction was,

> we encourage the court to consider a range of potential sanctions and to examine each party's actions. . . In particular, we believe remand should include but not be limited to: (1) examination of the materials provided to the court for in camera review; (2) a careful analysis of the extent to which Plaintiffs may have failed to

comply with discovery orders; and (3) whether any noncompliance was willful or was carefully calculated to preserve asserted privilege while narrowly construing the different orders. To the extent it is alleged Plaintiffs attempted to pay Anton to conceal evidence, the court on remand may need to conduct an evidentiary hearing. Any findings regarding this allegation would likely factor heavily into the sanctions analysis.

*Id.* at 905.

## 6.     Post-remand Discovery, Evidentiary Hearing, and Motion for Sanctions

After remand, the Court[2] permitted extensive discovery into the bribery allegations. During this discovery, the parties deposed almost all of the key witnesses, including Willard Conrad (Anton's attorney who telephoned Ms. Badger), Alan Barazi, Ms. Badger, and defense counsel David Harris. The parties did not depose Anton himself, who has disappeared along with the computer storing Plaintiffs' financial information. Defendants also investigated the financial ties between Barazi and Anton.

On August 2nd and 3rd, 2011, the Court held an evidentiary hearing receiving testimony on (1) the allegation that Plaintiffs attempted to pay Anton to conceal evidence (including evidence relating to the relationship between Nick Anton and Alan Barazi, evidence relating to whether the objective of the alleged scheme was achieved, evidence concerning the financial relationship between Anton and Barazi, and evidence of Anton's evasion of service); and (2) evidence related to Plaintiffs' credibility and the reliability of Plaintiffs' discovery responses with respect to alleged misstatements about the nature, extent, and history of the relationship between Anton and Barazi and their respective companies. During the hearing, Badger, Defense counsel David Harris, Defendant Equilon, employee Kevin Autin, and Barazi all testified in person.

---

[2] This case was administratively transferred to the undersigned Judge on July 28, 2009.

Before and after the evidentiary hearing, the parties submitted other evidence which the Court has considered. This evidence includes approximately twenty depositions and hundreds of exhibits comprised of thousands of pages of documents.

After the hearing, Defendants filed the pending Motion for Sanctions which the parties have thoroughly briefed.[3]

## Discussion

## I. Sanctions are appropriate under Rule 37(b).

Federal Rule of Civil Procedure Rule 37(b)(2)(A) authorizes a sanction of dismissal where there is (1) an order compelling discovery, (2) a willful violation of that order, and (3) prejudice to the other party. *Id.* at 899.

Defendants argue Plaintiffs should be sanctioned under Rule 37(b) for failure to comply with two orders compelling production of documents related to Chris Walls, the June 16, 2006 order ("the first order") and the September 8, 2006 order ("the fourth order").

### A. Plaintiffs willfully violated the June 16, 2006 order and prejudiced Defendants, but a lesser sanction than dismissal is warranted.

Defendants contend the Court's June 16, 2006 order required Plaintiffs to produce the analysis and the 58 documents on Plaintiffs' March privilege log. The Court holds that given the events leading up to the order's issuance, Plaintiffs failure to produce any documents was a willful violation. An appropriate sanction is that Walls be stricken as an expert witness.

The events leading-up to the issuance of the June 16, 2006 order are as follows. On May 17, 2006, Defense counsel David Harris took Walls' fact deposition. Plaintiffs' counsel Gordon Wells defended the deposition. During the deposition, Walls testified that since February 2005

---

[3] The Court notes that in both parties' briefing, the citation to the record is often inaccurate, lacks pinpoint citation, or both. The Court orders that in any subsequent filings references to any part of the record shall include accurate pinpoint citations. Instead of simply citing a document number, the parties shall cite to a specific page number.

Case 4:05-cv-00633-DGK   Document 655   Filed 09/30/12   Page 12 of 35

he had worked approximately 100% for Barazi's companies. Of this work, 98% of it consisted of assisting Barazi with his claims against Shell. After Plaintiffs received Shell's "Final Response to Issues" letter dated February 5, 2005, Walls analyzed issues raised in the letter on Plaintiffs' behalf in anticipation of litigation. At this time, Walls had not been engaged as an expert. After meeting with Plaintiffs' attorneys and Barazi, the attorneys instructed Walls to perform additional analysis identifying the root problems with the MSOs. This additional analysis was part of Walls' expert report.

Harris believed this analysis was discoverable and wanted to see it. There was some confusion about what was listed on Plaintiffs' March 2006 privilege log and what should have been listed. The attorneys discussed the matter off the record. When they went back on the record, Wells stated,

> I think perhaps, Mr. Harris, you were asking was there some sort of written document or analysis done in response to Exhibit 28 [sic], the Kevin Autin letter, before any direction from counsel that perhaps would not be privileged. My understanding of the answer to that question is, no, there was no such document done.
> Second question I believe you were then asking is the – and the answer would be that the analysis that was done in response to the Autin letter, the written letter, was done at the request of counsel.
> In the five-minute review that we have seen here, we don't see that on the privilege log in taking this quick look. . . I believe that that document is the rest of what was Hunt Exhibit 3 yesterday. [The parties marked this exhibit as Walls Exhibit 21, which] is the cover sheet to the written analysis that Mr. Walls did in response to the Autin letter, as you were inquiring about, and he prepared the entirety of that document at the request of counsel.

Walls Dep. at 364-65. Wells added the exhibit had inadvertently been produced and should have been withheld as privileged as the rest of the document was.

Case 4:05-cv-00633-DGK   Document 655   Filed 09/30/12   Page 13 of 35

Harris noted other problems with the Walls' documents on the privilege log. As an example, he noted an email from Chris Walls to Jeff King regarding a TRO application; Plaintiffs had listed an obviously incorrect date. Harris proposed that if he had any remaining "cleanup" questions concerning the privilege log, he ask them at Walls' upcoming expert deposition "because I assume it's all [the privileged documents] going to relate to [Walls' expert] analysis anyway." Walls Dep. at 366. Wells replied, "I believe it probably will, primarily." Walls Dep. at 366. Harris then confirmed that the documents listed on the privilege log related to Walls' expert report.

> Mr. Harris: Right. Because I assume everything that – at least on the privilege log for Mr. Walls is going to have pertinence, if at all, to his expert report that he's going to submit.

> Mr. Wells: I don't know if I can say everything, but I suspect in large degree that may well be true.

> Mr. Harris: Okay, that will be great.

Walls Dep. at 368. Plaintiffs, however, never produced any documents on the privilege log related to Walls.

The parties scheduled a discovery dispute teleconference for June 16, 2006 to discuss this and other discovery disputes with the Court. Pursuant to Local Rule 37.1, the day before the teleconference Defendants faxed Plaintiffs' and the Court a letter with exhibits listing the outstanding discovery disputes and summarizing Defendants' position. The heading for one of the disputes discussed in the letter is captioned "Expert Reports: Plaintiffs refuse to produce the information considered by employee Chris Walls in forming his expert opinion. See **Exhibit G**."

Lttr. dated June 15, 2006 from Defs.' Counsel Jacqueline Blocker (DEX 191)[4] at 2. Exhibit G is the March 2006 privilege log which lists the 58 Walls documents.

The parties discussed the Walls dispute during the phone conference.

> MR. HARRIS: Then the next problem is the Plaintiffs' expert report. The plaintiff – we've asked for the materials that the plaintiff utilized -- or the experts utilized were presented too, their work papers, their drafts, leading up to their expert report. They've refused to produce any of that stuff, and, in particular, we're concerned about Mr. Walls, who they claim is an employee of theirs.
>
> At Mr. Walls' deposition he testified that he's been working on a claim against Shell since February of 2005 and that the material that he was working on since February 2005 is the material that led up to and was the foundational material for his report that he submitted to the Court. Because during my deposition of Mr. Walls as a fact witness, I started to ask about what kind of analysis was he doing after February of 2005, and appropriately, plaintiffs objected and said, well, that is all related to his expert witness about which you will have an opportunity to depose him, but now they're not going to give me any of workup documents, the expert work papers, the earlier draft, all of that stuff, which I was, frankly, surprised at. That's customary, as I understand it, to be produced in these matters. We've got some authority if the Court wants it, but --
>
> THE COURT: No, I agree. What do you say, King?
>
> MR. KING: The documents that he's referring to about Mr. Walls are documents that Mr. Walls has, I believe around March or April of 2005, that he prepared are when plaintiffs were preparing to hire counsel to pursue this case, reports that he prepared to inform counsel exactly what was going on so they could understand the case.

---

[4] "DEX 191" means Defendants' Exhibit 191. As used in this order, "DEX" and "PEX" shall mean Defendants' and Plaintiffs' exhibits from the August 2011 evidentiary hearing.

Those documents -- those are privileged documents. Those aren't documents that were used to prepare an expert report. Those are documents that were used to give counsel an idea of the legal issues the plaintiffs were suffering so that they could understand whether to take the case, and then, once they took the case, to understand how to pursue these claims. That is an information -- in fact, the case that is cited by defendants is cited to show that in-house experts, which Mr. Walls is an in-house expert, that in-house experts are treated in the same way as an ordinary witness, an order witness employee of plaintiffs, who is helping prepare his company's attorney or potential attorneys to take the case. That information is given attorney/client privilege, and his status as an expert doesn't change that attorney/client privilege.

What Mr. Walls relied on in preparing his expert disclosures were the exhibits that were contained in the expert disclosures, as well as the documents received by Shell -- or received from Shell that were produced, the highly confidential documents, the confidential documents, the MSO model itself, the historic expense information, and that's -- Your Honor likely remembers when we were in front of you a month ago specifically for the purpose of getting Mr. Walls' access to highly confidential documents so that he could have the information necessary to conduct his expert report.

That's the information that he relied on. We identified that that was the type of information relied on, and because it was produced by Shell, they have full access to those documents.

MR. HARRIS: All I can do is quote you to what Mr. Walls testified to, that he testified at his deposition that the studies and workup that he did in 2005 was the foundational basis for his expert report. And, Your Honor, I think if we're going to get into a claim -- I mean, even if he shared it with the lawyers, if it then becomes part of his expert report that he's going to testify about, I think he's got to still give us that information, because once he elected to put it out on the record here and try to get an adjustment, he can't hide his work papers by saying I shared them with the lawyer, because it would be the same as me saying a draft of my expert report I don't have to produce because I showed it to the

lawyers before I finalized my expert report. I've never heard of that.

THE COURT: Okay. I'm going to rule that if Walls' deposition says that, that the studies and work papers he did in 2005 were his foundation for his expert reports, then you have to produce them, Mr. King.

MR. HARRIS: And I'll produce that to the Court –

THE COURT: If he's going to rely on it in any way for his expert report, he's got to produce it.

MR. HARRIS: And would that be true for the other experts as well, if --

THE COURT: Yes, it would.

MR. HARRIS: Because we've got no backup material for any of the other experts.

THE COURT: Yes, it would.

MR. HARRIS: All right. Then the next is the Rosa Nickelson documents . . .

Tr. of June 16, 2006 Tele. Conf. (DEX 194) at 53-56. Shortly after the hearing ended, the Court entered its order which stated in relevant part that, "For each of Plaintiffs' experts, Plaintiffs are ordered to produce the information considered by and/or relied upon in forming that expert's opinion." Doc. 177 at ¶ 7.

Plaintiffs, however, refused to disclose the analysis or any of the Walls' documents on the privilege log. Ignoring the fact that the Court had carefully listened to their arguments and clearly rejected them, Plaintiffs continued to insist that Walls had never relied on these documents and that they were privileged. Plaintiffs alleged that Harris had misrepresented Walls' testimony to the Court, and that Walls had never stated that he relied upon the privileged

Case 4:05-cv-00633-DGK   Document 655   Filed 09/30/12   Page 17 of 35

and withheld document in preparing his expert report. Plaintiffs vowed they would "not produce this privileged document." Lttr. dated June 26, 2006 from Pls.' Counsel Rebecca King to Defs.' Counsel Jacqueline Blocker (PEX 2) at 2.

In light of the above, the Court finds Plaintiffs willfully violated the Court's June 16, 2006 order. As a threshold matter, the Court finds the June 16 order was sufficiently clear[5] because there is no question Plaintiffs knew what documents were in dispute. This is evidenced by three facts. First, the parties had been wrangling about the discoverability of these documents for several weeks, since the first Walls deposition. Second, the day before the teleconference, Defendants sent Plaintiffs and the Court a list of the documents in dispute. Third, during the teleconference, Plaintiffs discussed the discoverability of these specific documents with the Court. Indeed, Plaintiffs' counsel described these documents to the Court:

> The documents that [Defense counsel is] referring to about Mr. Walls are documents that Mr. Walls has, I believe around March or April of 2005, that he prepared [] when Plaintiffs were preparing to hire counsel to pursue this case, reports that he prepared to inform counsel exactly what was going on so they could understand the case.

Tr. of June 16, 2006 Tele. Conf. (DEX 194) at 54.

Of course, the Court's written order could have been more specific; the Court could have listed the documents individually by Bates numbers. But the fact that the Court's order could have been more specific does not mean it was unclear, particularly given the context of the Court's ruling and the Plaintiffs' clear understanding of it.

---

[5] Plaintiffs contend the Eighth Circuit has already decided that the four discovery orders were unclear, intimating that the Court of Appeals considered each order individually and held it was ambiguous. What the Court of Appeals found was that the four discovery orders did not call for "production of the same documents." *Sentis*, 559 F.3d at 902. "The orders each contained slightly different descriptions of the documents to be produced, and Plaintiffs read each order in a limited fashion to limit production." *Id.* If the Court of Appeals had found the four orders were unclear, it would not have instructed this Court on remand to conduct "a careful analysis of the extent to which Plaintiffs may have failed to comply with discovery orders." *Id.* at 905.

The Court also finds Plaintiffs willfully failed to produce them. As used in the context of Rule 37(b), willful "implies a conscious or intentional failure to act, as distinguished from accidental or involuntary noncompliance." *Omaha Indian Tribe, Treaty of 1854 with U.S. v. Tract I-Blackbird Bend Area*, 933 F.2d 1462, 1468 (8th Cir. 1991). Plaintiffs deny they willfully failed to produce them, claiming if they violated the order, it happened despite their best efforts and good faith intentions. Plaintiffs assert they believed the attorney client-privilege applied, and they "made numerous efforts to clarify the uncertainty."

The Court is not persuaded. The Court finds little to no merit to Plaintiffs' attorney-client privilege claim. Halls' deposition testimony establishes he became an expert witness in February of 2005. The document dates in the privilege log establish that he created, read, or reviewed the documents after February of 2005, thus Defendants were entitled to discover them. But, even if Plaintiffs sincerely believed the documents were privileged, their belief did not void the Court's order or authorize Plaintiffs to ignore it. There is no good-faith exception to Rule 37(b), and the Court declines to write one into it. If a party intentionally fails to obey a discovery order, the willfulness requirement is satisfied.

The Court also finds Plaintiffs never—as they now claim—attempted to clarify the meaning of the Court's order. Plaintiffs did not file a motion to clarify or to reconsider the June 16 order, they waited three months and then filed an appeal. While they had every right to seek an interlocutory appeal, seeking an appeal is not the same thing as what they are now arguing—that they sought clarification of what the order required them to do. Plaintiffs knew what the June 16 order directed them to produce, they simply declined to produce it. Accordingly, the Court finds Plaintiffs' actions were willful.

Finally, the Court holds that although Defendants have been prejudiced, a lesser sanction than dismissal is appropriate. "A finding of 'prejudice' under Rule 37(b) is proper if the failure to make discovery impairs an opponent's ability to determine the factual merits of a party's claim." *Vainer v. O'Brien*, 351 F.3d 832, 839 (8th Cir. 2003) (discussing prejudice justifying dismissal). Prejudice does not require "irremedial harm" that can only be alleviated by "reopening discovery and postponing trial." *Adams v. Trs. of N.J. Brewery Emps. Pension Trust Fund*, 29 F.3d 863, 874 (3d. Cir. 1994). Prejudice includes "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party." *Id*. (quotation omitted). It also "includes deprivation of information through non-cooperation with discovery, and costs expended obtaining court orders to force compliance with discovery." *Id.*

By failing to provide the Walls' documents, Plaintiffs have prejudiced Defendants by impairing their ability to investigate Plaintiffs' claims and prepare a defense. Their actions should be punished, in part to deter others from engaging in similar conduct.

In deciding on an appropriate sanction, the Court notes Plaintiff's violation is akin to an expert witnesses failure to make required disclosures under Rule 26(a)(2)(B). Thus, the punishment should be analogous to that imposed for violating Rule 37(c)(1). *Carr v. Deeds*, 453 F.3d 593, 604 (4th Cir. 2006) (excluding expert witness for failure to provide an expert report). In the present case, striking Walls as an expert witness is an appropriate punishment. Furthermore, given the importance of expert witnesses to Plaintiffs' claims, Plaintiffs should be given an opportunity to substitute a new expert. Not allowing Plaintiffs to substitute a new expert would be tantamount to ordering dismissal, which would be too severe a sanction for this violation. Should Plaintiffs elect to substitute a new expert witness for Walls, however, they will

be required to reimburse Defendants for the reasonable expenses, including attorneys' fees, Defendants have incurred to date in preparing for Walls' testimony.

The Court has considered whether it is inequitable for Defendants to recover all of their reasonable expenses since Defendants' arguably could have tried to resolve this dispute in a more constructive fashion rather than exploiting Plaintiffs' violation for strategic advantage. The Court completely agrees with the Court of Appeals' observation that, at times, Defendants "appeared to have directed their efforts not toward effective discovery, but towards exaggeration of ancillary issues . . . and fanning the flames of the district court's discontent." Even so, given Plaintiffs' persistent refusal to comply with the rules of discovery, as discussed below in detail with respect to discovery related to Anton, the Court cannot fault Defendants for failing to spend more time trying to resolve this dispute amicably before seeking sanctions.

Accordingly, this portion of the motion is GRANTED IN PART.

**B.      Plaintiffs did not willfully violate the September 8, 2006 order.**

Defendants also contend Plaintiffs willfully violated the September 8, 2006 order which required production of "any and all document or analysis developed by Chris Walls relating to this litigation, regardless of whether the document is claimed as privileged or if Chris Walls relied upon said document" (Doc. 290). Assuming that the order was clear, the Court finds Plaintiffs did not willfully violate it since they produced some of the documents and their failure to produce the others was arguably because of a clerical error. Although the Court is frustrated by this "clerical error"—Plaintiffs have committed many such errors during discovery in this case—Plaintiffs unquestionably turned over at least some of the documents. This suggests the violation was not a willful violation. *Omaha Indian Tribe*, 933 F.2d at 1468 (distinguishing

accidental noncompliance from willful noncompliance).  The Court also notes that the Court of

Appeals indicated that

> Plaintiffs' election to produce the materials for in camera review
> would seem to be a technical violation of the [September 8]
> discovery order.  It is difficult, however, to call such a violation
> willful or to find prejudice where it would have been a simple
> matter for the court to permit Defendants to view or retrieve the
> documents.

*Sentis*, 559 F.3d at 903.  Accordingly, the Court finds no Rule 37(b) violation with respect to the

September 8 order.

## II.     Sanctions are appropriate under the Court's inherent authority.

Defendants also move for sanctions pursuant to the Court's inherent authority to regulate

the conduct of those who appear before it.  Defendants contend Plaintiffs should be sanctioned

with dismissal because (1) they bribed their accountant, Nick Anton, to conceal evidence; and (2)

they failed to preserve financial information vital to Defendants.  Because the Court's decision

rests in large part on its view of the testimony presented during the August 2011 evidentiary

hearing, the Court presents its factual findings first.

After carefully considering the credible testimony presented at the hearing in the light of

the voluminous written evidence submitted by the parties, the Court finds the relevant facts to be

as follows.

### Witness Credibility

The Court finds Badger, Harris, and Autin's testimony to be completely trustworthy, and

believes their testimony without reservation.

With respect to Willard Conrad, the Court finds most of his testimony is credible.  His

testimony that he telephoned Badger and told Badger his client possessed documents of interest

to her clients, is credible. His testimony that he does not now remember certain details of these phone calls, such as whether he told Badger his client had been offered money by Barazi, is not.

After observing Barazi testify for approximately six hours during the evidentiary hearing, the Court finds he is not credible. Barazi often avoided answering questions, delayed answering questions, or gave unresponsive answers. He was sufficiently evasive that the Court had to repeatedly intervene and admonish him to answer the question asked. When confronted with the fact that he had given contradictory answers while previously under oath, he made furtive glances around the courtroom, fidgeted, and appeared generally uncomfortable.

**Anton's Bribery Solicitation**

On November 14, 2005, Nick Anton instructed his attorney, Willard Conrad, to telephone one of Defendants' attorneys in the Sentis case. Conrad called Defense counsel Betsy Badger because her phone number was listed on the PACER system. Conrad represented Anton in various legal matters and specifically represented him in calling Badger. Anton was in the room with Conrad when he called Badger.

Conrad told Badger he was calling on behalf of his client who wanted to remain anonymous. His client wanted to know if Defendants would be interested in compensating him for some documents he had pertaining to this lawsuit. Conrad said his client did accounting work and had documents that would be beneficial to Defendants. Conrad said Anton wanted to see if he could be compensated for this information.

Conrad told Badger his client had been approached by Plaintiffs about these documents. Conrad told Badger that the principal of Sentis, who Conrad confirmed was "probably" Alan Barazi, had contacted Anton and offered him "remuneration" "to keep away" the documents

from Defendants. Conrad told Badger he did not know how much the other side had offered Anton.[6]

Conrad called Badger again that day. In the second call, he told her his client's name was Nick Anton, whom he identified as a business consultant for Barazi. Badger and Conrad discussed several things, including whether she could meet Anton, and if so, under what conditions. Badger asked Conrad why his client thought he should be paid for talking with her, and Conrad replied, because the other side has offered it.

On November 18, 2005 Harris telephoned Conrad. During this conversation, Conrad confirmed to Harris most of what had told Badger earlier. Conrad did not confirm or deny to Harris that Anton had told him that Barazi had offered him remuneration.

Finally, in late 2005, Anton telephoned Kevin Autin, who at that time was the general manager of the mid-continent region for Defendant Equilon. Anton told Autin that he had some information related to the litigation that would be of interest to Shell, but he wanted to be compensated for it.

**Plaintiffs' Failure to Identify Anton as Its Accountant**

On September 30, 2005, Plaintiffs filed their Rule 26 initial disclosures. The disclosures identified Plaintiffs' "financial records, including their records on the actual profit margin, revenues, and expenses for their operated stations during the term of the MSO Agreements." The disclosures failed to identify Nick Anton as the person responsible for creating and maintaining some of these records.

On November 11, 2005, Defendant Equilon served its first discovery requests on Plaintiffs. Equilon requested financial documents and asked Plaintiffs to identify "each and

---

[6] In his November 5, 2010 deposition, Conrad testified that he did not remember telling Badger that Anton had already been offered compensation by Barazi. The Court finds Badger's testimony more credible.

every accountant and bookkeeper."  On December 14, 2005, Plaintiffs responded that "plaintiffs state that their bookkeeper is Melissa Hurt."  Barazi signed the verification under oath swearing that to the best of his knowledge and belief, this response was true.  Despite the fact that Anton was Plaintiffs' outside accountant at the time, Plaintiffs failed to list him.

On May 2, 2006, Plaintiffs amended their answer to acknowledge that "Plaintiff's accountant is Nick Anton with Global Financial Group . . . He was employed by Plaintiffs during the first 8-9 months of 2004 and has served as their outside accountant since that time."  Plaintiffs contend the initial response was based on a "technical answer" to the interrogatory.

### Plaintiffs $50,000 Payment to Anton

In May of 2007, after Plaintiffs were effectively out of business and Plaintiffs' case had been dismissed, Plaintiffs, through Barazi, paid Anton's company $50,000.  Plaintiffs paid this money even after Barazi attended Anton's deposition in May 2006 and heard Anton testify about contacting Defendants to sell Plaintiffs' financial information.  When asked during his August 17, 2006 deposition whether Anton's offer made any difference to him, Barazi responded "It didn't."  In fact, during the evidentiary hearing, Barazi testified that he had never followed up with Anton on that issue, and he continued to entrust Anton with Plaintiffs' financial information.  During the evidentiary hearing, Barazi testified he still owes Anton $200,000.

### Plaintiffs Discovery Responses Concerning Payments to Anton

Plaintiffs' discovery responses with respect to Plaintiffs' payments to Anton have been consistently inaccurate and misleading.  For example, on November 24, 2010 Plaintiffs sent Defendants interrogatory responses stating that Plaintiffs, and anyone acting on Plaintiffs behalf, had paid Anton a total of $46,000 in 2004.[7]  During his January 15, 2011 deposition, Barazi confirmed that the $46,000 identified on Anton's 2004 Form 1099 represented all the payments

---

[7] Barazi signed a sworn verification for these answers dated February 2, 2011.

Plaintiffs had made to Anton for 2004. During the same 2011 deposition, Barazi testified that he never paid off Anton's credit cards or reimbursed him for expenses.

Through a detailed review of third-party documents, Defendants subsequently learned that Barazi's four companies[8] had actually paid Anton $115,000 in 2004 and made payments totaling $40,599.92 to Anton's credit cards in 2004. When confronted with the credit card payments at the evidentiary hearing, Barazi claimed the money was reimbursement for expenses. Plaintiffs, however, have not produced any invoices or documentation for reimbursed expenses. Plaintiffs' sworn discovery responses related to their 2006 payments to Anton are similarly incorrect.

### Statements Concerning Anton in Liquor License Applications

Defendants presented voluminous evidence that Barazi's discovery disclosures made under oath regarding Anton's role with Plaintiffs were inconsistent with statements Barazi made under oath in various liquor license applications. Barazi alternately described Anton as a "managing officer" or "managing director," consultant, or mere employee (a "warm body") as the situation suited Plaintiffs' needs. When confronted with the fact that he had made inconsistent statements under oath, Barazi shifted blame to the attorneys who prepared the applications.

### A. The evidence does not establish that Plaintiffs or Barazi attempted to bribe Anton. It establishes that Anton attempted to solicit a bribe from Defendants.

Plaintiffs argues that the evidence presented at the evidentiary hearing addresses the Eighth Circuit's concerns and reinforces the Court's finding in its June 14, 2007 order that Plaintiffs attempted to bribe Anton. The Court finds the evidence does not establish that

---

[8] Barazi incorporated two additional entities, Sencor Management, Inc. and Cortis Management, Inc., to provide all the employee services to the sites.

Plaintiffs or Barazi attempted to bribe Anton, but it does establish that Anton attempted to solicit a bribe from Defendants.

The Court finds that Conrad was Anton's attorney, and that Anton directed Conrad to contact Defense counsel because he wanted to know if Defendants would pay him for information he possessed about the Plaintiffs.[9]   Hence, he solicited a bribe from Defendants. There is no evidence, however, that in doing so he was acting as Plaintiffs' agent for their financial affairs.  Consequently, no bribe can be imputed to Plaintiffs.

There is circumstantial evidence supporting Defendants' claim that Plaintiffs attempted to bribe Anton, but it not enough to sanction Plaintiffs.  The evidence which supports this theory is: (1) Barazi paid Anton $50,000 in May of 2007; (2) Barazi claims he continued to trust Anton even after he offered to sell Plaintiffs' financial information to Defendants; and (3) Anton and his computer, which contain important financial records for Plaintiffs, are now gone.

The other evidence proffered by Defendants is not reliable.  Although Conrad reported to Badger that Anton told him that the principal of Sentis had offered him money to withhold information, these hearsay statements lack sufficient indicia of reliability.  Conrad has no personal knowledge of any conversation regarding bribes between Barazi and Anton.  Any knowledge Conrad has comes from Anton, and Conrad could have been mistaken or misunderstood something Anton told him.  It is hearsay at best.  Consequently, the Court gives Conrad's statement to Badger no weight.

---

[9] The Court also notes Anton had a financial motivation to solicit a bribe.  Throughout the relevant time period of this lawsuit, Anton was financially distressed.  He was going through a divorce, he was in bankruptcy, and he appeared to have limited sources of income.  He was also in a position to provide or withhold useful information from Defendants.  He possessed detailed knowledge of Plaintiffs' financial information, as well as a computer on which he stored and analyzed this information.

The Court also rejects Defendants' assertion that the Court may infer that Barazi bribed Anton from the fact that Barazi is not credible. While Barazi denied the allegation and he is generally not credible, that does not mean that whatever he denies is true.

Because there is insufficient evidence that Barazi offered Anton a bribe, this portion of the motion for sanctions is denied.

### B.    Plaintiffs are sanctioned for failing to preserve discovery.

Defendants also argue that the Court should impose sanctions for Plaintiffs alleged failure to preserve critical financial documents, that is, spoliation. Spoliation is "the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010). "The right to impose sanctions for spoliation arises from the court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct which abuses the judicial process." *Id.* If a litigant commits spoliation, a district court has considerable flexibility in fashioning a sanction. An appropriate sanction "'should serve both fairness and punitive functions,' but its severity should correspond to the district court's finding after a 'fact-intensive inquiry into a party's degree of fault' under the circumstances, including the recognition that a party's degree of fault may 'rang[e] from innocence through the degrees of negligence to intentionality.'" *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 554 (6th Cir. 2010) (quoting *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc).

Defendants contend Plaintiffs failed to preserve MSO computers,[10] check registers and checks, miscellaneous evidence of payments to Anton, and documents on Anton's computer. Defendants maintain Plaintiffs' failure to preserve this evidence was intentional and is evidenced

---

[10] These are computers located in each store that were electronically linked to Plaintiffs' headquarters.

by the fact that Plaintiffs never instructed Anton to preserve or collect any information, even after the bribery allegation surfaced. They argue Defendants' have consistently failed to provide discovery related to Anton. Finally, Defendants assert they have been substantially and irreparably prejudiced by this, and so Plaintiffs' case should be dismissed with prejudice.

Plaintiffs respond that no spoliation has occurred because Defendants either received or had unfettered access to all Plaintiffs documents and information. Arguing in the alternative, Plaintiffs submit that Defendants cannot prove intentional destruction. They also dispute whether Defendants have been prejudiced by any the loss of any information, because the lost information is either irrelevant to Plaintiffs' claims or Defendants already had access to it. In the event sanctions are warranted, Plaintiffs suggest they should be limited to exclusion of Plaintiffs' damages theory.

### 1. Plaintiffs failed to preserve a variety of items, including documents on Anton's computer.

As an initial matter, the Court finds Plaintiffs failed to preserve MSO computers, check registers and checks, evidence of payments to Anton, and Anton's computer. With respect to information in the MSO computers, although Plaintiffs contend copies of this data have been preserved, the record does not support this finding. With respect to the check registers/checks and evidence of payments to Anton, Plaintiffs do not contest that these were not preserved.

Turning to Anton's computer, Plaintiffs argue there was no failure to preserve the information on it because Defendants had unfettered access to the computer and the financial information on it, at least until Anton became unavailable. Plaintiffs intimate that as long as a litigant has provided the opposing party with access to the materials in its possession, it is under no obligation to preserve the materials and cannot be sanctioned if the materials are subsequently

lost. Plaintiffs, however, fail to cite any legal authority for this proposition, and the Court cannot find any.

On the contrary, the law provides that "parties must preserve potentially relevant evidence under their 'control.'" *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. MD 2010). "[D]ocuments are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *Id.* It is well-established that financial records held by a party's accountant are within the party's 'control' for purposes of discovery. *E.g., MGP Ingredients, Inc. v. Mars, Inc.*, No. 06-2318-JWL-DJW, 2007 WL 3353401, at *3 (D. Kan. Nov. 10, 2007). Consequently, the Court holds Plaintiffs failed to preserve the information on Anton's computer.

### 2. This failure to preserve was intentional.

"A spoliation-of-evidence sanction requires a finding of intentional destruction indicating a desire to suppress the truth." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (internal quotation omitted). However, the law recognizes that "[i]ntent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir. 2004). In this case, there is a wealth of circumstantial evidence related to Anton and Plaintiffs' financial records which support a finding of intentional destruction.

By 2005, Plaintiffs only had a handful of employees left, and Barazi and Anton had exclusive control over Plaintiffs' expense records. While this made record keeping easier in some ways, for example, it obviated the need to issue a formal litigation hold to a group of people, it also made Barazi solely responsible for any spoliation. Since Anton was the outside

accountant who reported to Barazi, Barazi effectively had absolute control of all the records. If there is a problem, he is to blame. Unfortunately, Barazi consistently failed to preserve various financial records related to or utilized by Anton, and they are now gone.

Barazi's failure to preserve or produce this evidence was not a single mistake nor an isolated event; it was ongoing and systematic. As was amply demonstrated during the evidentiary hearing, all of the most important records related to Plaintiffs' operating expenses are now gone, as is the individual (Anton) who tracked and reported these expenses, the computer he used, and any reliable record of what his compensation actually was. The only records that may still exist are in a massive "pile" of boxes in a Chicago storage facility where, based on Plaintiffs' photographs of these boxes, the documents are in questionable condition. Aug. 2-3, 2012, Evidentiary Hearing Tr. ("Tr.") at 443; pictures (PEX 279).

The loss of Plaintiffs' financial information, particularly information that passed through Anton's hands or that relates to Anton's compensation, is so widespread that it cannot be mere negligence. There is a discernible pattern here of depriving Defendants of access to this information. First, Plaintiffs did not even identify Anton as their accountant until seven months into the litigation. In fact, they arguably misled Defendants by identifying someone else, Melissa Hurt, as their accountant. Second, the loss of the various financial reports prepared by Anton and kept on his computer appears aimed at preventing Defendants from learning what Plaintiffs' expenses actually were. This deprives Defendants of their announced defense that Plaintiffs were, in fact, profitable. Third, the failure to preserve and produce any receipts or invoices[11] related to Anton's compensation or reimbursement thwarts Defendants' efforts to determine how much Anton was paid, or should have been paid, and so impeach Plaintiffs'

_____

[11] The Court finds each of Barazi's various explanations for why these things have never been produced—these were based on oral agreements; he does not have them; he has them, but they are in storage in Chicago—not credible.

31

recordkeeping and general credibility. Obviously, it precluded Defendants from determining whether the $50,000 paid to Anton in May of 2007 was a bribe or an overdue payment for wages. Fourth, and perhaps most damning, is that even after it was revealed that Anton had solicited bribes from at least the Defendants, neither Barazi or Plaintiffs (or Plaintiffs' counsel) ever took any measures to safeguard or copy the financial information on Anton's computer. Consequently, the Court holds Plaintiffs' intentionally destroyed financial information by "losing" it under circumstances that evidence a desire to suppress the truth.

### 3. Defendants have been irreparably prejudiced.

Defendants assert they have been irreparably prejudiced from the loss of Plaintiffs' financial records, particularly those on Anton's computer, because the missing evidence lies at the heart of their defenses. First, Defendants claim Plaintiffs were profitable but concealed these profits by creative bookkeeping, and they cannot attack Plaintiffs' phantom losses without the information in the missing documents. Second, they argue that Plaintiffs' benefit of the bargain theory, when properly understood, also implicates Plaintiffs' financial performance. While this theory primarily involves looking at payments under the contract, as part of determining what the contract means by "reasonable, legitimate, and necessary expenses," Defendants are entitled to evaluate Plaintiff's expenses to show that they were unreasonable. Third, Defendants argue that any alternate sources of information available to them are inferior.

As a threshold matter, the Court finds the loss of the check registers and checks, evidence of payments to Anton, and information contained in the MSO computers will prejudice Defendants, but it will not irreparably prejudice them. The loss of the information contained in the MSO computers is not by itself fatal, because that raw information was stored in other places, like Anton's computer. The loss of check registers and checks can probably be replaced, albeit

at some expense, by ordering thousands of duplicate checks and other bank records. Likewise, Defendants may be able to overcome Plaintiffs' failure to produce evidence of Plaintiffs' payments to Anton by continuing to investigate and ferret out other payments that Barazi did not disclose, like the $50,000 payment in May 2007. To ameliorate the prejudice of having to perform this investigation, the Court could order Plaintiffs to reimburse Defendants for their costs or issue an adverse inference instruction.

The loss of Anton's computer, however, will irreparably prejudice Defendants because the information on it is unique and irreplaceable. The computer contains a large amount of raw information, no one knows exactly how much; this information is stored in a very accessible form, electronically as opposed to in hard copy; the information includes reports generated by Anton that are not saved anywhere else; and, most importantly, the computer is needed to determine the methods Anton used to calculate Plaintiffs' expenses.

The Court rejects Plaintiffs' assertion that the information stored on Anton's computer is available in a hard copy form stored in Chicago. As a threshold matter, it was clear from Barazi's testimony during the evidentiary hearing that he does not know everything that is (or was) on Anton's computer, thus he is not competent to testify whether everything on Anton's computer could be recreated from the "pile" of documents stored in Chicago. Tr. at 318, 397. Indeed, it is unclear whether Barazi even knows what is stored in the boxes in Chicago, much less what is on Anton's computer.

Even if recreating the information on Anton's computer were theoretically possible, there are insurmountable practical problems to doing so. First, judging from Plaintiffs' pictures of the storage unit (PEX 279), at least some of the boxes have been damaged from the weight of other boxes, exposure to water and mold, or both. Thus, some of the documents inside the boxes are

likely to be unusable. Second, assuming it is physically possible to scan all the documents, it will likely not be cost-effective. There are a staggering number of documents to scan. The storage facility contains approximately 2,000 "bankers boxes;" there are an estimated one to two million payroll sheets alone. TR. at 321, 325. Third, given Barazi's credibility and the fact that he is the only person who has had access to these documents for several years, the Court is concerned whether these documents are complete or may have been purged of information useful to Defendants.

Finally, assuming a database of the raw data in the hard copies could be compiled, it would not be equivalent to what was on Anton's computer. Anton's computer contained more than just data, it included reports he generated based on his judgment about what data to use and what calculations to make. Unfortunately, no one knows what accounting methods he used, or how he reached his conclusions. Barazi, for example, testified he does not know what methods Anton used to calculate amortization and depreciation, or how he determined how much to pay in sales taxes. Tr. at 422, 427. Even if the underlying data could be recreated, Anton's reports cannot be. Consequently, Defendants have been irreparably prejudiced by the loss of Anton's computer.

### 4. Plaintiffs' misconduct warrants dismissal.

Once a violation has been found, a court must consider a range of potential sanctions. *Sentis*, 559 F.3d at 905. "[B]efore imposing the sanction of dismissal, fairness requires a court to consider whether a lesser sanction is available or appropriate." *Keefer v. Provident Life & Accident Ins. Co.*, 238 F.3d 937, 941 (8th Cir. 2000). "The district court is not, however, constrained to impose the least onerous sanction available, but may exercise its discretion to choose the most appropriate sanction under the circumstances." *Id.*

In this case, the Court finds Plaintiffs' consistently evasive and deceptive conduct has culminated with the loss of irreplaceable information on Anton's computer. The Court further finds that without this information, Defendants cannot receive a fair trial. This is a problem created by Plaintiffs' bad faith which cannot be cured by a lesser sanction such as ordering additional discovery, striking evidence, or issuing an adverse instruction. Accordingly, after considering a wide variety of possible sanctions, the holds a lesser sanction than dismissal with prejudice is not available or appropriate.

In summary, the Court holds that pursuant to its inherent authority Plaintiffs should be sanctioned with dismissal for their bad-faith failure to preserve evidence.

## Conclusion

For the foregoing reasons, the Court orders Plaintiffs' expert witness Chris Walls is stricken as a sanction for Plaintiffs violating Rule 37(b) and that Plaintiffs' claims are dismissed with prejudice as a sanction for Plaintiffs' bad faith failure to preserve evidence.

Defendants' Motion for Sanctions (Doc. 645) is GRANTED.

**IT IS SO ORDERED.**

DATE:  September 30, 2012                              /s/ Greg Kays
                                                       GREG KAYS, JUDGE
                                                       UNITED STATES DISTRICT COURT